## ADAMS v. BERG.

4-5802                                                137 S. W. 2d 912

Opinion delivered February 26, 1940.

McHANEY, J. Appellants brought this action against appellees to cancel a certain oil and gas lease covering approximately 12 acres of land in Union county, described by metes and bounds, and being a part of lots 7 and 1 of section 7, township 18 south, range 17 west, which said lease was assigned to appellant Coffee and appellee Porter by the other appellees, and to recover the purchase price paid by Coffee of $12,000 for such assignment. They also sought to recover certain moneys paid by Coffee to Porter for oil payments reserved under said assignment. The ground of the action was the fraud alleged to have been perpetrated on appellants by the appellees, Berg, Laney, Dudney, Gordon, and Porter, who defended on the ground of a general denial of the allegations of the complaint. In addition, Porter defended on the ground that he bought the lease from one Tom Green for the consideration expressed in said assignment, $24,000 in cash and $24,000 in oil payments, and that he had no dealings, no agreement or contract with the other appellees. Trial resulted in a decree dismissing the complaint as against all appellees, except Porter, against whom a judgment was rendered for $1,714.75 in favor of Coffee, being the amount paid Porter for oil payments reserved, and his interest in said lease was divested out of him and vested in Coffee.

We think the overwhelming weight of the evidence establishes the fact that appellee Porter devised a scheme to defraud appellants and that the other appellees actively joined with Porter in such scheme and aided and abetted him in its consummation. The facts are, as disclosed by the evidence, that Adams and Coffee were friends; that Coffee went to El Dorado from his home in Minden, Louisiana, about the middle of March, 1938, at the request or invitation of Adams, for the purpose of making an investment in oil properties; that they were invited by Porter to ride with him out in the oil fields and to Magnolia which they did; and that while on this trip Porter showed them on a map the location of the

lease in question and told them he was going to buy it. He said the lease was very expensive, was as "high as Hell, but it has a million in oil under it," and would cost $24,000 in cash and $24,000 in oil. He invited appellants to join him in the purchase of the lease, if his associates in the Crescent Drilling Company of which he represented himself to be the vice-president did not wish to join, on a 50-50 basis. Appellants agreed to join him in this purchase, if his associates did not, and they were deposited at their hotel to await his reply. A short time later he called on appellants at the hotel, advised them that his associates did not care to join him in the lease purchase and it was agreed that the deal would be closed the next morning in the law office of Senator Marlin. Present at this meeting were all the parties to this litigation, including the wives of owners of the lease. Berg and Laney owned 3/7ths of the lease, known locally as the Ruple lease, and Gordon and Dudney owned a 4/7ths interest. Marlin was to prepare the papers, examine the title and act as escrow agent until the title was approved and the deal closed. In the presence of all parties, Marlin inquired what the consideration was, and Gordon replied, in the presence and hearing of the others, that it was $24,000 in cash and $24,000 in oil. As to whether Gordon made this statement or whether it was by Porter or someone else is in dispute, but it can make no difference who made it. The fact remains that the statement was made as a fact and they all acquiesced in it. The papers were drawn. Porter wrote his check for $12,000 and delivered it to Marlin. Coffee had Marlin write out a check for him on his bank in Louisiana for $12,000, which he signed and delivered to Marlin. Whereupon Adams told Marlin to examine that title with a "magnifying glass," and Dudney said, "I want you to turn these checks into cash." The fact is, by virtue of a preconceived agreement between the appellees, Porter's check was to be returned to him and he was to pay nothing for his half interest in the lease. Coffee's check, put up for himself and Adams, they to share equally in the ownership of a half interest, was deposited for collection and was promptly paid. The proceeds, after paying exchange on the foreign check,

were distributed to appellees, other than Porter, less a commission of 5 per cent which was paid to Tom Green. A short time later, on Porter's representation that he had paid Dudney and Gordon $3,428.50 for their share of the oil reservation, Coffee paid Porter the sum of $1,714.25 for one-half thereof, when as a matter of fact Porter had paid said Dudney and Gordon nothing, because the oil reservation was bogus. As to what occurred in Marlin's office the morning the deal was closed by escrow, Dudney testified that when they arrived in El Dorado, Porter called them off (referring to himself and Gordon) and told them that the deal was to be $24,000 and $24,000, and told them to go through with the deal on that basis. He then said he told Porter "Under no circumstances would I, until I had talked to Mr. Berg and Mr. Laney, that we were a little surprised about the way they were going to get more out of it than we could, so we called Mr. Berg and Mr. Laney out and talked to them and it was agreeable to them." He also testified that Coffee wrote his check for $12,000 and Porter wrote his and they were handed to Marlin. He said: "I then stated 'Tom, I have one request to make, I want you to convert those checks into money.' I knew that one of those was not going to be cashed and I felt that some one was being taken for a half interest. In our assignment we reserved an oil payment of $10,714. Out of this assignment we assigned $6,867 to Harry Porter. Porter didn't pay us anything for it, as that represented the oil payment we were not to retain." Subsequently, when Adams and Coffee were in Magnolia, investigating matters, he admitted he knew they were being robbed. He was asked the following question and gave the subjoined answer: "Q. Didn't you tell Mr. Coffee, then and there, that you knew he was being robbed, but that that was the only way you could get the deal over and you couldn't say anything? A. I may have stated something along that line, but that was after Adams had disclosed the real owner. I may have made such a statement."

We think it would serve no useful purpose to set out more of the facts and circumstances showing that

appellants were defrauded in the deal and that all the appellees were parties to it. There is a lot more evidence to the same effect. In fact it is not seriously disputed.

But, in defense of the decree, counsel for appellees, other than Porter, who has filed no brief in his behalf, say that if any fraud was practiced, it was Porter's fraud for which they are not responsible. We cannot agree. The facts already recited show conclusively that they all became parties to Porter's fraudulent scheme, that they discussed it with him and entered into it for the purpose of reaping one-half the spoils.

Nor can we agree with appellees' contention that appellants waived their right to rescind by ratification or otherwise. After appellants became suspicious that they had been defrauded, they undertook at once to find out from appellees the true facts. Adams approached Berg who told him he knew they were being fleeced, but that that was the only way they could make the sale and get their money. When Adams approached Dudney and Gordon and asked them to tell him the facts, they went out, conferred together, came back and Dudney said, "You are asking us a very delicate question, and one you shouldn't ask." They finally "spilled the beans," however, but said Adams told them, if they would tell him the facts, he and Coffee would look to Porter and not to them for their money, and that all he wanted was an assignment from Porter for the other half of the lease. Adams denies making any such statement to Dudney and Gordon, but even if he did, this would not create an estoppel in bar of this action.

Finally it is contended by appellees other than Porter in support of the decree in their favor that appellants did not return or offer to return their interest in the lease, which, it was contended, is a condition precedent to the bringing of this action. We cannot agree. In the first place appellants owned only a one-half interest in the lease and could not convey or offer to convey back the whole lease. In the second place, this is a suit to cancel the instruments conveying the whole lease, and amounts to the same thing as an offer to convey.

The decree will be reversed and the cause remanded with directions to cancel the lease and to enter judgment against all the appellees in favor of appellants for $12,000 and $1,714.25, with interest from the respective dates of the checks for said amounts, and all costs. It is so ordered.